597 S.E.2d 888

**The STATE, Respondent,**

v.

**Chad E. SMITH, Appellant.**

**No. 3804.**

Court of Appeals of South Carolina.

Submitted April 6, 2004.

Decided June 1, 2004.

Henry Morris Anderson, Jr., of Florence, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Asst. Deputy Attorney General Charles H. Richardson, Asst. Attorney General W. Rutledge Martin, all of Columbia; and Solicitor John Gregory Hembree, of Conway, for Respondent.

HUFF, J.:

Appellant Chad Smith appeals from his convictions for homicide by child abuse and aiding and abetting homicide by child abuse. He asserts the trial judge erred in denying his motion for directed verdict and in denying his motion to sever his trial from that of his co-defendant. We affirm.

### FACTUAL/PROCEDURAL BACKGROUND

Smith was convicted for his actions surrounding the death of Jordyn Durant, the daughter of Smith's co-defendant, Celeste Durant. In December 1999, Celeste separated from her hus-

band, Brad Durant, with whom she had two daughters, twenty month-old Jordyn and Taylor, who was five years old at the time of the trial. Celeste became involved with Smith at some point, and Smith moved in with Celeste in February 2000. During the separation, Celeste and Brad shared custody of the children, with Celeste having them during the week and Brad having them every weekend. On Friday afternoon, July 14, 2000, Celeste phoned Brad and told him she and Smith were taking the children on a trip to the beach. The following Sunday night, Brad learned that Jordyn had been injured. Celeste told Brad they did not know what had happened to Jordyn. On Monday, July 17, 2000, Jordyn Durant died shortly after she was taken off life support.

The testimony at trial reveals that late in the evening of July 14, Smith, Celeste, Taylor, and Jordyn checked into room 408 at the Days Inn Motel in Myrtle Beach. Celeste told investigators that the children awoke the next morning and watched cartoons for a little while, and then they all dressed to go down to the beach. After spending some time on the beach, they went to the pool area. Celeste noticed Jordyn had been acting strangely that morning, and the child fell asleep in a float in the pool. At that point, she took Jordyn up to the room and attempted to feed her, but she would not eat. She gave Jordyn a bath and put her down for a nap around 12:30. When Jordyn woke up around 3:00 p.m., she was unsteady on her feet, could not walk, and fell "flat on her face." Celeste called her pediatrician in Florence, who told her to take Jordyn to the local emergency room.

Smith and Celeste took Jordyn and Taylor to Grand Strand Memorial Hospital, where Jordyn was examined by doctors. Celeste told investigators Jordyn was running a fever and the doctor was not sure what was wrong with her. After an x-ray, they found Jordyn had a skull fracture, but they believed it was an old fracture. After leaving the hospital, they went to a pharmacy to get Jordyn some Dramamine, as prescribed by the doctor. They then went to get some pizza, but Jordyn again would not eat. They went back to the motel room and fell asleep. They woke up the next morning around 8:00, and found Jordyn was difficult to wake up and was still unsteady on her feet. They checked out of their room around 10:30 that morning and went to Broadway at the Beach and Ripley's

Aquarium and had lunch. Jordyn stayed in her stroller the whole time, mostly sleeping, and would not eat lunch. They went to one more place after lunch, and then headed back to Florence. Celeste indicated Jordyn slept the whole trip back, and she put the child in her bed when they got home around 4:00 or 5:00 that afternoon. When Celeste went to check on Jordyn, she found blood coming from her mouth. She called out to Smith, who began to perform CPR on the child until EMS responded. Celeste told investigators Jordyn was never out of her sight while they were in Myrtle Beach and she was never left alone with Smith or anyone else.

Smith similarly told an investigator that the four arrived at the motel around 11:30 that Friday evening and checked into room 408. He indicated, they went down on the beach around 10:30 the next morning, staying there for close to an hour before they went to the pool. Jordyn fell asleep in her float in the pool and they went upstairs, where Jordyn took a nap. After Jordyn woke up from her nap around 2:00 p.m., Smith took her out of bed and stood her up, but when she took a step, she lost her balance and fell forward on her face. He attempted to stand her up again, but she could not walk. Smith told the investigator Jordyn experienced projectile vomiting, which was dark in color. Smith used the word "we" when talking about their activities that day, and never indicated a time when he and Celeste were not together during the weekend trip.

Aside from the time they stated Jordyn fell "flat on her face" when she attempted to walk, both Celeste and Smith told investigators that Jordyn had not fallen, she had not hit her head, and nothing had happened to her.

Dr. Orion Colfer treated Jordyn on July 15, 2000 when she came to the emergency room at Grand Strand Memorial Hospital. The child arrived at the emergency room at 4:45 vomiting and having difficulty walking. In the initial interview, Celeste did not mention an accident or fall. Dr. Colfer ordered a CAT scan, and the radiologist reported Jordyn appeared to have an old skull fracture that did not show evidence of acute injury to either the brain or the soft tissue at the site of the fracture. Upon re-interview of Celeste, she told Dr. Colfer that Jordyn had fallen at daycare at some

point in the past. There were no signs of bruising or swelling to indicate a traumatic injury. Dr. Colfer asked a pediatrician to examine Jordyn, and it was the pediatrician's opinion the child was suffering from a viral infection, possibly an ear infection and vertigo, that was causing her difficulty walking and her fever.

When Jordyn was transported to Carolinas Hospital System the evening of July 16, Dr. Carl John Chelen, a pediatric intensivist, was paged. At the time she arrived at the hospital, Jordyn was comatose, but was still breathing and had a normal heart rate. By the time Dr. Chelan arrived fifteen to twenty minutes later, her condition had deteriorated to the point that she was having difficulty breathing, and the emergency room physician had to put a breathing tube in Jordyn. Dr. Chelen accompanied Jordyn while another CAT scan was performed. About halfway thorough the scan, he observed evidence of significant bleeding in Jordyn's brain. Dr. Chelen began treating Jordyn for swelling in her brain and made immediate arrangements to transfer her to McLeod Medical Center. He testified there was a major difference between the CAT scan taken the day before and the one taken that evening, in that the swelling of the brain and bleeding into the brain were not evident in the CAT scan taken at Grand Strand Memorial Hospital. He further stated the difference in the two scans helped determine when the injury occurred, because with a head injury, if there is going to be internal bleeding, it normally occurs within twenty-four to forty-eight hours, with more severe injuries showing bleeding earlier. Based on the onset of symptoms as well as the fact that there was a skull fracture with no bleeding or brain swelling at the first CAT scan, he believed the injury had occurred within several hours of the first scan.

On Monday morning, July 17, 2000, Dr. Gerald Atwood, the pediatric intensive care unit director at McLeod, assumed responsibility for Jordyn. Dr. Atwood testified Jordyn had sustained severe neurological deficit. Her CAT scans revealed she had a very large fracture in the back of her head, and there was evidence of bleeding into the brain near the fracture site as well as on the opposite side of the fracture. Her brain was markedly swollen and appeared to not be getting adequate blood supply. At that point, Jordyn had

very severe brain damage. The fracture left Jordyn with a free-floating piece of bone in her skull, and the brain was so swollen that it was pushing that piece of bone out, and part of her brain was pushed out through the fracture site. Dr. Atwood stated the swelling of her brain was caused by some trauma she had sustained and it was suspected Jordyn was also shaken, as evidenced by hemorrhaging of the blood vessels in her eyes that is only seen in shaken baby syndrome. He further testified the fracture was located at the hardest part of the skull, it would take tremendous force to cause that area to fracture, and because there were no external signs of a laceration, indentation or bruising, something broad and flat, as opposed to sharp or thin, would have caused this injury. He stated that the reason the initial CAT scan did not show evidence of bleeding and swelling in the brain even though the fracture was there was that Jordyn's brain was in a period of blood flow shutdown at that time. He thus determined the injury to Jordyn had to occur within a few hours of the CAT scan taken in Myrtle Beach. Dr. Atwood opined there was no way Jordyn or her sister could have caused the injury to Jordyn, noting it was not just a skull fracture, but there was also an injury from shaking, and the shaking injury alone could have caused her to be brain dead. He testified that this was "unquestionably ... [a case of] child abuse, this child was shaken and this child received trauma to her head."

When Dr. Atwood met with Celeste and Brad and explained their child would probably be declared brain dead, Celeste asked him how old the skull fracture was. Dr. Atwood told her that it could not be more than a few days old and in his opinion it occurred at the same time as the traumatic injury to the brain occurred, probably on that Saturday. He emphasized to Celeste that the time of injury was not the most important issue at that moment. Celeste asked Dr. Atwood for a second opinion. Dr. Atwood thought she was referring to the issue of Jordyn possibly being brain dead, but Celeste clarified she wanted a second opinion as to the timing of the injury. Two other doctors concurred with Dr. Atwood. Celeste told Dr. Atwood she opposed an autopsy of Jordyn, but he informed her that was not her decision to make.

Because it was a suspicious or unnatural death, Dr. Clay Nichols performed an autopsy on Jordyn. Dr. Nichols found a

depressed skull fracture, where part of the bone pressed into Jordyn's brain. He also found another fracture on the left side of Jordyn's skull. The brain was very swollen due to the injury. Dr. Nichols testified the skull fracture could not have been caused by a fall on the floor or by another young child pushing Jordyn, and that her injuries were the end result of a severe beating with intentional force applied to the back of her head. Additionally, Dr. Nichols testified the degree and severity of the injury to Jordyn would cause immediate neurological problems which would be fairly obvious to an observer who had been around the child. He stated she died as a result of blows to her head as opposed to a single blow, and "[t]here were two fracture sites, plus also the pattern of the bleeding ... to the right side of the head ... the back, the neck, the shoulders, and the left side."

Margo Grant, the Days Inn housekeeper who was responsible for cleaning room 408 at the time Smith and Celeste stayed there, testified the occupants of that room did not want their room cleaned during their stay. She further testified that one particular morning when they were having a lot of checkouts, her supervisor, Priscilla Flowers, noticed there were no linens in room 408 and questioned her about it. Ms. Grant had not stripped the room. When she went into the room, Ms. Grant found there were no sheets or towels or bedspreads in the room. Ms. Flowers likewise testified that on July 16, 2000, she went to room 408 to strip it for Ms. Grant, but discovered all linens except a spread and one sheet were missing. She stated all the towels, the other sheets, and the trash were gone from the room.

During the course of his investigation, Sergeant Hancock went over to the home of Celeste and Smith. When he went into Jordyn's room, he discovered the child's flat sheet was missing from the bed, as well as the pillowcase from an apparently blood stained pillow. When he inquired about the pillowcase, Celeste went into another bedroom and returned to state she could not find it. When Hancock informed her it was important that they find it, Celeste went over and whispered some communication with Smith. Smith then walked into the bedroom and came right back with the pillowcase. Hancock also testified that when he arrived at the hospital to investigate, he visually inspected and photographed several

bruises on Jordyn including some on her collarbone, neck, shoulder, forearm and trunk. The nurse indicated these would not have been caused by medical treatment.

At the start of the trial, a motion was made to sever Celeste's trial from Smith's. The trial court initially granted the motion because Celeste had been charged under an additional indictment to the homicide by child abuse and aiding and abetting, while Smith had not. In response to this ruling, the State dismissed the additional count against Celeste. Because the additional charge was no longer a concern, the trial court reversed its earlier ruling and denied the motion to sever. The trial of Smith and Celeste then proceeded jointly.

At the close of the State's case, both Smith and Celeste moved for directed verdicts. After some deliberation over the matter, the trial judge denied the motions. In doing so, she noted the evidence showed the victim was with the defendants during the time frame the serious injury occurred, the defendants were the only responsible adults dealing with the child at that time, the evidence showed it was not an accident but was intentional, the injury could not have been caused by another child, who was the only other person present, and could not have been caused by the victim herself. The judge further noted that Smith, in particular, knew the victim had experienced projectile vomiting, but this information was not relayed to medical personnel. She also found the missing linens were some evidence of an attempted cover-up of what happened to Jordyn, and neither defendant told the medical personnel about the serious injury that was inflicted on Jordyn even though they had an opportunity to do so.

After a five-day trial, the jury convicted both Smith and Celeste of homicide by child abuse and aiding and abetting homicide by child abuse. On October 10, 2001, the trial court sentenced Smith to twenty years on each count. This appeal follows.

## ISSUES

I. Did the trial court err in denying Appellant's motion to sever?

II. Did the trial court err in denying Appellant's motion for directed verdict?

## LAW/ANALYSIS

### I. Separate Trials

■ Smith argues the trial court abused its discretion in failing to sever his trial from that of Celeste. Specifically, he contends he was prejudiced by evidence presented by Celeste at trial through the testimony of Dr. Susan Van Epps and Gail Mercuri, which put him in the position of having to defend himself from both the State and Celeste. We find no error.

■ Criminal defendants who are jointly tried for murder are not entitled to separate trials as a matter of right. *State v. Nichols,* 325 S.C. 111, 122, 481 S.E.2d 118, 124 (1997). A motion for severance is addressed to the discretion of the trial court and the court's ruling should not be disturbed on appeal absent an abuse of that discretion. *Id.* Further, "[t]he general rule allowing joint trials applies with equal force when a defendant's severance motion is based upon the likelihood he and a codefendant will present mutually antagonistic defenses, i.e., accuse one another of committing the crime." *State v. Dennis,* 337 S.C. 275, 281, 523 S.E.2d 173, 176 (1999). To successfully challenge the trial court's exercise of discretion in denying a motion to sever, the defendant must demonstrate some prejudice resulting from the joint trial. *State v. Thompson,* 279 S.C. 405, 408, 308 S.E.2d 364, 366 (1983).

We first note, although it is clear that a motion for severance was made by Celeste's attorney, the record does not show that the motion was joined in or individually made by Smith. Further, even if Smith did move for severance, there is no evidence he requested severance based on the issue he now raises on appeal. Finally, the issues presented in the record by Celeste's attorney were that of the additional indictment of Celeste and the possible inconsistency of statements. Because the record does not reflect that the issue raised by Smith on appeal was raised to the court below, it is questionable whether this issue is properly before us on appeal. *See State v. Nichols,* 325 S.C. 111, 120, 481 S.E.2d 118, 123 (1997) (issue may not be raised for first time on appeal, but must have been raised to trial judge to be preserved for appellate review).

At any rate, Smith's argument fails for two reasons. First, the general rule allowing joint trials is not impugned simply

because the codefendants may present evidence accusing each other of the crime. *Dennis,* 337 S.C. at 281, 523 S.E.2d at 176. Second, Smith failed to include the testimony of the two witnesses of which he complains in the record on appeal. Thus, this Court is unable to discern any prejudice. *See State v. Mitchell,* 330 S.C. 189, 194, 498 S.E.2d 642, 645 (1998) (the burden is on appellant to provide a sufficient record for review); *Thompson,* 279 S.C. at 408, 308 S.E.2d at 366 (for reversal, a defendant tried jointly must show prejudice). Accordingly, we find no error in the trial court's refusal to sever the trials.

## II.  Directed Verdict

■ Smith also asserts the trial court erred in denying his motion for directed verdict as the evidence was insufficient to support his convictions. He contends there was insufficient substantial circumstantial evidence presented by the State to allow the case to go to the jury, and his mere presence at the scene was insufficient to prove his guilt as a principal or as an aider or abettor. We disagree.

In reviewing the denial of a motion for a directed verdict, this court must view the evidence in the light most favorable to the State, and if there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find that the case was properly submitted to the jury. *State v. Kelsey,* 331 S.C. 50, 62, 502 S.E.2d 63, 69 (1998). In ruling on a directed verdict motion, the trial court is concerned with the existence of evidence, not its weight. *Id.* If the State presents any evidence which reasonably tends to prove the defendant's guilt or from which his guilt could be fairly and logically deduced, the trial court must send the case to the jury. *State v. Jarrell,* 350 S.C. 90, 97, 564 S.E.2d 362, 366 (Ct.App.2002). This court may reverse the trial court's denial of a motion for a directed verdict only if there is no evidence to support the trial court's ruling. *State v. Lindsey,* 355 S.C. 15, 20, 583 S.E.2d 740, 742 (2003).

The State charged Smith with homicide by child abuse and aiding and abetting homicide by child abuse. These crimes are codified as follows:

A person is guilty of homicide by child abuse if the person:

(1) causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life; or

(2) knowingly aids and abets another person to commit child abuse or neglect, and the child abuse or neglect results in the death of a child under the age of eleven.

S.C.Code Ann. § 16–3–85(A) (2003). "Child abuse or neglect" is defined under the statute as "an **act or omission** by any person which causes harm to the child's physical health or welfare." S.C.Code Ann. § 16–3–85(B)(1) (2003) (emphasis added). Further, the statute provides that one causes harm to a child's physical health or welfare when one "**inflicts or allows to be inflicted** upon the child physical injury, including injuries sustained as a result of excessive corporal punishment." S.C.Code Ann. § 16–3–85(B)(2)(a) (2003) (emphasis added). "Aid and abet" has been defined as "[h]elp, assist, or facilitate the commission of a crime, promote the accomplishment thereof, help in advancing or bringing it about, or encourage, counsel, or incite as to its commission." Black's Law Dictionary 68 (6th ed.1990). "It comprehends all assistance rendered by words, acts, encouragement, support, or presence, actual or constructive, to render assistance if necessary." *Id.*

The evidence adduced at trial indicated Jordyn sustained her devastating injury on Saturday, July 15, and that it had to have occurred within several hours of her first CAT scan at Grand Strand Memorial Hospital. During this time period, Smith and Celeste were the only two persons with Jordyn who could have possibly caused her injury. Celeste told investigators she was with Jordyn the whole time and, in his statement to investigators, Smith referred to all of their actions that day as "we," never indicating a time when he and Celeste were not together during that weekend.

The medical testimony also revealed that Jordyn did not suffer from a single skull fracture, but that she had two distinct fracture sites, and she suffered from more than one blow to her head. Further, there was evidence that Jordyn also suffered from shaken baby syndrome, which alone was enough to cause her to become brain dead. There was evidence presented that the injury to Jordyn was severe and

would cause immediate neurological problems which would have been fairly obvious to Smith and Celeste. More importantly, Dr. Nichols stated her injuries were the end result of a severe beating with intentional force applied to the back of her head, and Dr. Atwood testified that the injury was unquestionably the result of child abuse.

The statute makes clear that child abuse may be committed by either **an act or an omission** which causes harm to a child's physical health. S.C.Code Ann. § 16–3–85(B)(1). Additionally, harm to a child's health occurs when a person either **inflicts, or allows to be inflicted** physical injury upon a child. S.C.Code Ann. § 16–3–85(B)(2)(a). Given the evidence on the severity and number of injuries to Jordyn, the fact that both Smith and Celeste were the only adults with Jordyn during the time frame that she received her injuries and were the only people who could have possibly caused her injuries, the evidence that her impairment should have been obvious to these two adults, along with the evidence of possible cover-up, we find there was sufficient evidence of an act or omission by Smith wherein he inflicted or allowed to be inflicted physical harm to Jordyn resulting in Jordyn's death. Accordingly, there was substantial circumstantial evidence reasonably tending to prove the guilt of Smith such that the charges were properly submitted to the jury.

For the foregoing reasons, Smith's convictions are

**AFFIRMED.**

STILWELL, J. and CURETON, A.J., concur.