743 S.E.2d 124

**The STATE, Respondent,**

v.

**Richard Brandon LEWIS, Appellant.**

**Appellate Case No.2011–187128.**

**No. 5132.**

Court of Appeals of South Carolina.

Heard Feb. 5, 2013.
Decided May 15, 2013.
Rehearing Denied June 20, 2013.

346

C. Rauch Wise, of Greenwood, for Appellant.

Attorney General Alan M. Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Salley W. Elliott, and Senior Assistant Attorney General Harold M. Coombs, Jr., all of Columbia; and Solicitor Jerry W. Peace of Greenwood, for Respondent.

LOCKEMY, J.

Richard Brandon Lewis appeals his conviction of aiding and abetting homicide by child abuse (aiding and abetting). He argues the trial court erred in: (1) failing to direct a verdict in his favor on the charge of aiding and abetting; (2) failing to charge the jury that the State had to prove Lewis had a legal duty to protect Audrina Hepburn (Victim) before he could be convicted of aiding and abetting; (3) not granting a mistrial after a witness testified a statement by Lewis had "the possibility of guilt behind it"; and (4) not requiring the State to open fully on the law and the facts. We reverse.

## FACTS

Lewis began dating Ashley Hepburn, mother of Victim, in early 2009. Hepburn was separated from her husband, with whom she had two children, Victim and Owen.[1] Hepburn and her children lived with her mother, Doris Davis, and Davis's boyfriend, David Crumley.

Around 3:30 p.m. on October 12, 2009, Lewis stopped at Hepburn's home on his way back from class at Piedmont Technical College. Lewis stated Hepburn was upset about a withdrawn job offer, and they had an argument that was initially playful, but resulted in her slapping Lewis. Lewis left Hepburn's home after their fight and went to his grandmother's home, where he lived. However, he returned to Hepburn's home around 8:30 p.m. Davis and Crumley had retired to bed for the night when he returned. Hepburn told Lewis she was extremely tired and would not be good company, but he did not leave.

At some point in the evening, Owen accidentally hit Lewis while they were playing and then refused to apologize to Lewis. Lewis told Hepburn if Owen did not listen to her now, he was never going to listen to her, and a fight ensued about her parenting skills. Subsequently, Hepburn and Lewis began putting the children to bed. It took two attempts to put Victim to sleep because she was fussy. Then Owen refused to brush his teeth, and Hepburn spanked him, causing him to cry. Lewis said he felt responsible and guilty for the spanking because of his comments to Hepburn earlier, and so he went to the living room by himself to watch football. Hepburn went to her room with Owen where they laid in bed.

Later in the evening, Lewis checked on Victim and did not see anything out of the ordinary. He then went to Hepburn's room and asked if she wanted to watch a movie, but she declined. While watching the movie alone in the living room, Lewis heard Victim cry and thereafter heard Hepburn stomp down the hall to Victim's room. Victim continued crying for a few minutes before stopping. Lewis described the crying as being broken up with short pauses, "like she could have been shaken," but in that moment he did not think anything had

---

1. On the date of the incident, Victim was sixteen months old, and Owen was almost three years old.

happened to Victim. After Hepburn returned to her room, Lewis went to her and asked if she wanted any food, but she did not, so he ate by himself and prepared for bed. He checked on Victim once more, but this time he noticed she was in an unusual position, facedown with her head against the bars of the crib. When he picked her up, he noticed she was not breathing properly and had blood around her mouth. He carried Victim into Hepburn's room and Hepburn took her from him. Davis and Crumley awoke to Lewis's and Hepburn's cries, and Crumley called 911. When questioned by Crumley, Lewis explained he had found Victim unresponsive and believed she had a seizure. His opinion stemmed from his personal experience with a seizure condition that resulted in his discharge from the navy.

Paramedics arrived at Hepburn's home around 1:40 a.m. and transported Victim to Self Regional Hospital (Self Regional). Dr. Michelle Curry suspected a brain injury, which was confirmed by a CAT scan. She also suspected the brain injury was caused by shaking, and the Laurens County Sheriff's Office (Sheriff's Office) and the Department of Social Services (DSS) were notified. Lewis told Dr. Curry he found Victim unresponsive but did not tell her Hepburn had stomped into Victim's room shortly before his discovery. Hepburn was present during his explanation to Dr. Curry, but she also stated Victim was simply found limp and unresponsive in her crib. Victim was transferred to Greenville Memorial Hospital where a pediatrician, Robert Seigler, determined the symptoms from her severe injury would have been immediately noticeable. Victim survived for three more days before being removed from life support and passing away.

Around 6:20 a.m. the morning of the incident, Lewis accepted law enforcement's request to come by the Sheriff's Office, and he gave a statement to Officer Ben Blackmon and other officers. In his initial statement, he did not mention hearing Hepburn's loud footsteps down the hall prior to discovering Victim's condition; he simply said he found Victim unresponsive. Additionally, he did not tell the officers about his argument with Hepburn earlier in the night that resulted in her slapping him. Lewis testified that at the time of the initial statement, he did not want to get Hepburn in trouble and did not believe Hepburn would do anything to hurt Victim. After his initial statement, he spoke with his grand-

mother, who urged him to tell the officers anything he knew about the case. Lewis then gave officers a second statement and explained he had heard Victim crying followed by Hepburn's loud footsteps and then louder crying from Victim, "as if she was being shaken."

Hepburn also spoke with law enforcement within approximately twelve hours of Victim entering the Greenville Hospital, and in her initial interview with South Carolina Law Enforcement Division (SLED) agent, Casey Kirkland, she did not indicate Lewis was involved in Victim's injuries. Hepburn stated Lewis was "watching TV during all of this," and she was asleep, except for the two times she was awakened by Lewis, first asking about food and then with Victim in his arms. At trial, Hepburn implicated Lewis, asserting Lewis was the only person who could have harmed Victim. However, she conceded she never heard a sound, and she did not know Victim was hurt until Lewis brought Victim to her.

Officer Robert Plaxico, from the Sheriff's Office, also spoke with Hepburn and showed her Lewis's second statement. Officer Plaxico stated that when shown the statement, she said, "[O]h my god all of this is true but I don't remember hurting my baby." However, she explained her exclamation pertained to putting Owen to bed and the difficulty she had brushing his teeth because Lewis's statement was accurate in that respect. Officer Plaxico stated Hepburn never implicated Lewis during her interview with him.

Officer Plaxico visited Lewis's grandmother's home a couple of days after the incident, and when he arrived, Lewis ran out the back door. However, Lewis returned a couple of minutes later and told Plaxico he ran because he thought he was going to be arrested. Lewis was unable to give Plaxico any further information, and Plaxico left the home. A few days later, Lewis was admitted to the Laurens County Hospital for a suicide attempt. Lewis was not arrested until September 18, 2010, when he was charged with homicide by child abuse and aiding and abetting.

Lewis and Hepburn were tried jointly on February 22, 2011. The State introduced Alexander Brown, Self Regional's chaplain, as a witness, and he testified his position required him to serve as a caretaker, "emotionally, spiritually, and mentally," for patients and their families. Brown testified that during

his time with Victim's family, Lewis stated Victim "didn't like him but he loved her." Brown thought Lewis's statement was odd, and it caused him concern. Hepburn's counsel asked Brown why he thought the comment was odd, and Lewis's counsel objected on the basis that Brown was not qualified as an expert, and it was speculative. The trial court asked for a foundation to explain "how long [Brown] worked [at Self Regional] or something like that." Brown testified he had two years of seminary education, which included activities such as analyzing conversations he had with patients to see "why we ask what we ask and what flags might have been drawn by things that [the patients] have said." When Hepburn's counsel asked Brown again why Lewis's comment caused him concern, Lewis's counsel objected to it as speculative. The trial court overruled the objection, stating the answer was being received for the purpose of showing Brown's reaction to that moment and stated Lewis's counsel was welcome to cross-examine Brown on the issue. Brown answered that Lewis's comment "appeared to be a statement that had the possibility of having guilt behind it." Lewis's counsel objected once again, and the objection was sustained. Lewis moved for a mistrial, arguing Brown had testified as to his opinion that Lewis was guilty, which he maintained was far beyond anything admissible in court. The trial court gave the jury a curative instruction instead of granting a mistrial.

At the end of the State's case, Lewis asked for a directed verdict on both charges, which was denied by the trial court. Lewis renewed his directed verdict motion on the charge of aiding and abetting at the close of the trial, and the trial court again denied it. On March 3, 2011, the jury found Lewis guilty of aiding and abetting homicide by child abuse, but acquitted him on the charge of homicide by child abuse. The jury found Hepburn guilty of homicide by child abuse. The trial court sentenced Lewis to ten years, suspended upon service of seven years, and sentenced Hepburn to forty-five years.

## LAW/ANALYSIS

### Directed Verdict on the Charge of Aiding and Abetting

Lewis contends the trial court erred in denying his directed verdict motion because the State presented no evidence to support the charge of aiding and abetting. We agree.

 "In reviewing the denial of a motion for a directed verdict, this court must view the evidence in the light most favorable to the State, and if there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find that the case was properly submitted to the jury." *State v. Smith*, 359 S.C. 481, 490, 597 S.E.2d 888, 893 (Ct.App.2004) (citing *State v. Kelsey*, 331 S.C. 50, 62, 502 S.E.2d 63, 69 (1998)). "In ruling on a directed verdict motion, the trial court is concerned with the existence of evidence, not its weight." *Id.* (citing *Kelsey*, 331 S.C. at 62, 502 S.E.2d at 69). "If the State presents any evidence which reasonably tends to prove the defendant's guilt or from which his guilt could be fairly and logically deduced, the trial court must send the case to the jury." *Id.* (citing *State v. Jarrell*, 350 S.C. 90, 97, 564 S.E.2d 362, 366 (Ct.App. 2002)).

 "The trial judge should grant a directed verdict when the evidence merely raises a suspicion that the accused is guilty." *State v. Zeigler*, 364 S.C. 94, 102, 610 S.E.2d 859, 863 (Ct.App.2005) (citing *State v. Arnold*, 361 S.C. 386, 390, 605 S.E.2d 529, 531 (2004); *State v. Schrock*, 283 S.C. 129, 132, 322 S.E.2d 450, 452 (1984)). " 'Suspicion implies a belief or opinion as to guilt based upon facts or circumstances which do not amount to proof.' " *Id.* (quoting *State v. Cherry*, 361 S.C. 588, 594, 606 S.E.2d 475, 478 (2004); *State v. Lollis*, 343 S.C. 580, 584, 541 S.E.2d 254, 256 (2001)). " 'However, a trial judge is not required to find that the evidence infers guilt to the exclusion of any other reasonable hypothesis.' " *Id.* at 102–03, 610 S.E.2d at 863 (quoting *Cherry*, 361 S.C. at 594, 606 S.E.2d at 478; *State v. Ballenger*, 322 S.C. 196, 470 S.E.2d 851 (1996)). This court may reverse the trial court's denial of a motion for a directed verdict only if there is no evidence to support the trial court's ruling. *Id.* at 103, 610 S.E.2d at 863 (citing *State v. Gaster*, 349 S.C. 545, 555, 564 S.E.2d 87, 92–93 (2002)).

"A person is guilty of homicide by child abuse if the person . . . knowingly aids and abets another person to commit child abuse or neglect, and the child abuse or neglect results in the death of a child under the age of eleven." S.C. Ann.Code § 16–3–85(A)(2) (2003). "Child abuse or neglect" is defined under the statute as "an act or omission by any person which

causes harm to the child's physical health or welfare." § 16–3–85(B)(1). Further, the statute provides that one causes harm to a child's physical health or welfare when one "inflicts or allows to be inflicted upon the child physical injury, including injuries sustained as a result of excessive corporal punishment." § 16–3–85(B)(2)(a). "Aid and abet" is defined as "assist[ing] or facilitat[ing] the commission of a crime or ... promot[ing] its accomplishment." Black's Law Dictionary 81 (9th ed.2009).

" 'Under accomplice liability theory, a person must personally commit the crime or be present at the scene of the crime and intentionally, or through a common design, aid, abet, or assist in the commission of that crime through some overt act.' " *State v. Mattison,* 388 S.C. 469, 479, 697 S.E.2d 578, 584 (2010) (quoting *State v. Langley,* 334 S.C. 643, 648–49, 515 S.E.2d 98, 101 (1999)). " 'In order to be guilty as an aider or abettor, the participant must be chargeable with knowledge of the principal's criminal conduct.' " *Id.* at 480, 697 S.E.2d at 584 (quoting *State v. Leonard,* 292 S.C. 133, 137, 355 S.E.2d 270, 272 (1987)); *see Wilson v. Wilson,* 319 S.C. 370, 373, 461 S.E.2d 816, 817 (1995) ("Prior knowledge that a crime is going to be committed, without more, is not sufficient to make a person guilty of the crime."). " 'Mere presence at the scene is not sufficient to establish guilt as an aider or abettor.' " *Mattison,* 388 S.C. at 480, 697 S.E.2d at 584 (quoting *Leonard,* 292 S.C. at 137, 355 S.E.2d at 272). "However, 'presence at the scene of a crime by pre-arrangement to aid, encourage, or abet in the perpetration of the crime constitutes guilt as a [principal].' " *Id.* (quoting *State v. Hill,* 268 S.C. 390, 395–96, 234 S.E.2d 219, 221 (1977)).

In *State v. Smith,* the victim passed away from severe injuries sustained by abuse. 359 S.C. 481, 486–87, 597 S.E.2d 888, 891–92 (Ct.App.2004). The two defendants, the victim's mother and the mother's boyfriend, were tried together on charges of homicide by child abuse and aiding and abetting. *Id.* at 488, 597 S.E.2d at 892. The jury found each defendant guilty of both charges. *Id.* The mother's boyfriend appealed his conviction, arguing the trial court should have granted his directed verdict motion on his charge of aiding and abetting. *Id.* at 490, 597 S.E.2d at 893. On appeal, this court noted that in their statements to investigators both defendants indicated

they were never separated from each other or the victim during the time when her injuries occurred. *Id.* at 491, 597 S.E.2d at 894. Medical testimony established the injury was unquestionably the result of child abuse. *Id.* at 492, 597 S.E.2d at 894. We found the statute made it clear "child abuse may be committed by either an act or an omission which causes harm to a child's physical health." *Id.* (citing S.C.Code Ann. § 16–3–85(B)(1) (2003)) (emphasis omitted). This court then determined

> [g]iven the evidence on the severity and number of injuries to [the victim], the fact that both [the mother and the mother's boyfriend] were the only adults with [the victim] during the time frame that she received her injuries and were the only people who could have possibly caused her injuries, the evidence that her impairment should have been obvious to these two adults, along with the evidence of possible cover-up, . . . there was sufficient evidence of an act or omission by [the mother's boyfriend] wherein he inflicted or allowed to be inflicted physical harm to [the victim] resulting in [the victim's] death.

*Id.*

In the present case, both Lewis and Hepburn assert they were in separate rooms during the time of the incident and not within eyesight of each other. Hepburn claimed she was asleep during the incident, and Lewis claimed he was in the living room watching the television. We believe this is an important distinction from *Smith*. Hepburn's and Lewis's statements to investigators and testimony implicate one or the other as having committed homicide by child abuse. Lewis stated he was in the living room and simply heard Hepburn walk loudly into Victim's room, at which point he heard Victim's crying eventually stop. He testified he subsequently discovered the Victim's abnormal condition when checking on her. Hepburn claimed she never went into Victim's room after placing her in the crib for the second time, and she asserted Lewis was the only person who could have harmed Victim that night.

The record does not contain any evidence to support this conviction. The State argues because Lewis instigated, abetted, and witnessed Hepburn's spanking of Owen, and

then "witnessed Hepburn's disciplinary outburst against her infant daughter," he "knew then what he knew later." First, there is no evidence to support the claim that Lewis witnessed Hepburn discipline her infant daughter. Second, we disagree with the State's contention that because he witnessed Hepburn spank Owen earlier in the night, he knew Hepburn was going to abuse Victim. Even if Lewis did have prior knowledge Hepburn was going to commit a crime, without more, that was insufficient to constitute guilt. *See Wilson v. Wilson,* 319 S.C. 370, 373, 461 S.E.2d 816, 817 (1995).

Next, the State argues Lewis can be held liable as an aider or abettor for his failure to act—specifically, his failure to enter Victim's room and stop any abuse after hearing her crying. However, an overt act is required to be held liable for aiding and abetting, which necessarily excludes the possibility of being held liable for a failure to act. *See State v. Mattison,* 388 S.C. 469, 479, 697 S.E.2d 578, 584 (2010). Thus, his failure to act, assuming he knew a crime was occurring, cannot suffice as evidence of aiding and abetting. In the present case, any other finding would nullify the mere presence charge. *See* 21 Am.Jur.2d *Criminal Law* § 172 (2008) (explaining "there normally must be some evidence that the reason that the accused is present is to further the criminal intent of the perpetrator").

Moreover, the State must also present evidence of the requisite mental state for the charge of aiding and abetting, which the statute provides is "knowingly." *See* 21 Am.Jur.2d *Criminal Law* § 131 (2008) (stating the term knowingly, as used in criminal statutes, "imports that an accused person knew what he or she was doing"). In *Smith,* the defendants indicated they were never apart during the weekend, and the mother's boyfriend further admitted witnessing the victim's resulting side effects from the abuse, yet did not tell medical personnel. 359 S.C. at 491–92, 597 S.E.2d at 894. Thus, the court found the evidence was sufficient to establish to a jury that he knowingly aided and abetted in the crime. *Id.* at 492, 597 S.E.2d at 894. As we previously stated, the parties here assert they were apart during the incident, and Lewis testified the moment he found Victim's condition to be odd, he brought her to Hepburn and medical personnel were immediately

called. Lewis stated it was only after he was told about the implications of Victim's injuries did he realize Victim's sounds that night could have been the result of someone shaking her. Initially, he thought Victim had suffered a seizure. We find the State did not present evidence to prove the requisite mental state for aiding and abetting.

The State also asserts Lewis's flight and suicide attempt are sufficient evidence to withstand a directed verdict. We disagree with the State's contention under these facts. The State did not present any evidence of an overt act or the requisite state of mind for aiding and abetting, and thus, evidence of flight and a suicide attempt alone will not suffice to withstand a motion for a directed verdict. *See State v. Odems*, 395 S.C. 582, 590, 720 S.E.2d 48, 52 (declining to hold "that flight alone is substantial circumstantial evidence of a defendant's guilt"). Accordingly, we reverse the trial court.

Because we find a directed verdict should have been granted in Lewis's favor, we need not address his remaining arguments. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (ruling an appellate court need not review remaining issues when its determination of a prior issue is dispositive of the appeal).

## CONCLUSION

We find there was no evidence to support the charge of aiding and abetting against Lewis, and a directed verdict should have been granted in Lewis's favor. For the foregoing reasons, the trial court is

**REVERSED.**

FEW, C.J., concurring.

I join in the majority opinion except for one sentence: "We find the State did not present evidence to prove the requisite mental state for aiding and abetting." For two reasons, I would not make that statement. First, the statement is unnecessary to the resolution of the appeal, and is therefore dicta, because we found the State presented no evidence that Lewis knew or had reason to know Hepburn had abused or neglected the victim in time to save the child's life. Thus, there is no evidence that Lewis committed any act to aid or

abet Hepburn with homicide. Second, the State will almost never have direct evidence of a defendant's mental state. Therefore, the law expects that the State will rely on circumstantial evidence to meet its burden of proof on this issue. "[I]ntent is seldom susceptible to proof by direct evidence and must ordinarily be proven by circumstantial evidence, that is, by facts and circumstances from which intent may be inferred. Circumstantial evidence alone is often sufficient to show criminal intent because the element of intent, being a state of mind or mental purpose, is usually incapable of direct proof." *State v. Cherry*, 348 S.C. 281, 288, 559 S.E.2d 297, 300 (Ct.App.2001) (Goolsby, J., concurring) (internal citations and quotations omitted), *aff'd but criticized,* 361 S.C. 588, 606 S.E.2d 475 (2004). In this case, there is ample circumstantial evidence that would require the trial court to deny a directed verdict as to Lewis's mental state if the State had proven Lewis acted to aid or abet.