654 S.E.2d 292

**The STATE, Respondent,**

v.

**Jacob LYNCH, Appellant.**

No. 4317.

Court of Appeals of South Carolina.

Submitted Nov. 1, 2007.

Decided Nov. 27, 2007.

Appellate Defender Kathrine H. Hudgins, South Carolina Commission on Indigent Defense, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Attorney General Norman Mark Rapoport, Office of the Attorney General, of Columbia; and Solicitor C. Kelly Jackson, of Sumter, for Respondent.

WILLIAMS, J.:

In this criminal case, we affirm the trial court's holding that an inmate was not entitled to be advised of his *Miranda*[1] rights when he spoke to a television reporter.

## FACTS

Prisoners rioted at the Lee Correctional Institution located in Bishopville, South Carolina. Correctional Officers Marcus Cotton (Cotton) and Kenneth Dozier (Dozier) were working in the Chesterfield Housing Unit at the time of the riot. Prior to the incident, Cotton was providing meals to inmates located in the south side of the Chesterfield Unit, while Dozier provided meals to inmates located in the north side of the Chesterfield Unit.

Cotton opened inmate Jacob Lynch's (Lynch) cell door to furnish Lynch a meal. While the door of his cell was open, Lynch escaped. Cotton ordered Lynch to return to his cell, but Lynch refused. Rather than attempting to force Lynch back into his cell, Cotton continued with the feeding duties.[2] Cotton then opened inmate Tyrone Singletary's (Singletary) cell to provide him with a meal. Singletary absconded from his cell and refused to return.

Lynch and Singletary released other prisoners in the Chesterfield Unit and took Cotton hostage. Cotton testified that during the struggle to capture him, Lynch and Singletary stabbed him with a shank.[3]

Shortly after Cotton's capture, Dozier, who was delivering meals to the inmates on the north side, noticed Lynch and Singletary. Lynch and Singletary attempted to capture Dozier, but Dozier managed to barricade himself in a room. Lynch and Singletary sought to seize Dozier by breaking the

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. Cotton's explanation for why he continued with his duties instead of attempting to return Lynch to his cell is that correctional officers are trained not to engage in a combative situation by themselves. Rather, officers are required to obtain assistance from other prison officers.

3. A shank is a homemade knife, most often time used by prisoners.

door. Lynch and Singletary threatened to kill Dozier and tried to stab Dozier. However, neither apprehended Dozier.

Cotton described Lynch as the leader of the riot. During the subsequent hours of negotiations with law enforcement, Lynch controlled Cotton. During the confrontation with law enforcement officials, Lynch would repeatedly come to the door of the Chesterfield Unit with Cotton handcuffed to him and demand access to the media. Lynch and Singletary threatened to kill Cotton and Dozier if their demands were not met.

Craig Melvin [4] (Melvin), along with other members of the media, covered the riot at Lee Correctional Institution. The media requested an interview with the head of the Corrections Department, John Ozmint (Ozmint). In response, Ozmint obtained the names and cell phone numbers of the members of the media who were present at the riot. Ozmint called Melvin, and as a result of that call, Melvin entered the prison.

Shortly before being interviewed by Melvin, Lynch released Cotton and surrendered. Lynch was charged with two counts of taking a hostage, rioting, assaulting a correctional officer, carrying a weapon by an inmate, and inciting a riot. The jury convicted Lynch on each count. Consequently, Lynch was sentenced to life without the possibility of parole for the hostage counts, ten years for rioting, five years for assaulting a correctional officer, ten years for carrying a weapon by an inmate, and ten years for inciting a riot. This appeal follows.

## STANDARD OF REVIEW

In criminal cases, this Court reviews errors of law only. *State v. Wilson,* 345 S.C. 1, 5–6, 545 S.E.2d 827, 829 (2001). An appellate court is bound by the trial court's factual findings unless they are clearly erroneous. *State v. Banda,* 371 S.C. 245, 251, 639 S.E.2d 36, 39 (2006). Therefore, the trial court's determination of whether a defendant was deprived of his *Miranda* rights will be upheld unless unsupported by the record. *State v. Navy,* 370 S.C. 398, 405, 635 S.E.2d 549, 553 (Ct.App.2006) ("Appellate review of whether a person is in custody for *Miranda* purposes is limited to a determination of whether the trial judges ruling is supported by the record.");

---

4. Melvin is a reporter with the Columbia television station WIS.

*see State v. Easler,* 322 S.C. 333, 342, 471 S.E.2d 745, 751 (Ct.App.1996) (Appellate review on issue of whether defendant was in custody triggering *Miranda* warnings is limited to determination of whether the ruling by the trial court is supported by testimony.).

## LAW/ANALYSIS

Lynch puts forth two arguments on appeal. Shortly after Lynch released Cotton, Melvin interviewed Lynch. During this interview, Lynch made several incriminating statements. Lynch asked the trial court to suppress these statements, arguing Melvin became an agent of the State at the time of the interview. Lynch contended statements made to Melvin were obtained through custodial interrogation initiated by law enforcement officials without *Miranda* warnings. The trial court denied this motion.

Lynch also objected to the introduction of videos obtained by the Department of Corrections. The videos were taken during and subsequent to the riot. They show, among other things, the negotiations between the inmates and law enforcement officials and the condition of the Chesterfield Unit after the riot. Lynch argued the videos would inflame the passion of the jury and their prejudicial effect outweighed their probative value. The trial court overruled this objection. We address each argument in turn.

### A. The trial court correctly held that *Miranda* warnings were not required.

The Fifth Amendment provides, "No person shall be ... compelled in any criminal case to be a witness against himself".... U.S. Const. amend. V. Based on the Fifth Amendment's protection against self-incrimination, the United States Supreme Court announced, "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards".... *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. *Miranda* rights [5] attach only if the suspect is subject to custodial interrogation. *State v. Kennedy,* 325 S.C. 295, 303, 479 S.E.2d 838, 842 (Ct.App.1996).

---

**5.** The well-known *Miranda* rights are that the accused must be informed of: the right to remain silent; any statement made may be used

 Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. Specifically, interrogation is either express questioning or its functional equivalent. *Kennedy*, 325 S.C. at 303, 479 S.E.2d at 842. The functional equivalent of an interrogation includes words or action on the part of the police, other than those that normally follow an arrest or custody, that the police should know are reasonably likely to elicit an incriminating response from the suspect. *State v. Binney*, 362 S.C. 353, 359, 608 S.E.2d 418, 421 (2005).

In the present case, Lynch was not subject to custodial interrogation when he spoke with Melvin. Law enforcement officials at the site of the riot did not question Lynch. Rather Lynch demanded, as a condition to release Cotton and as a condition of surrender, access to the media. Melvin was provided to accommodate Lynchs demands. During the interview, Melvin was acting as a private citizen, namely a reporter, and not as an agent of the State. Melvins testimony supports this conclusion.

Q: [A]s your **duties as a news reporter,** anchor, did you have an opportunity to come to Lee County ... to cover a story at the Lee Correctional Institute?

A: Yes.

Q: What was that story?

. . .

A: I was told ... that there were some inmates who had taken some guards hostage and that they were requesting [a] member of the media to speak with.

Q: And you became that member of the media?

A: Yes.

. . .

Q: [W]hen the situation ended, when the crisis was over, did you interview a specific inmate named Jacob Lynch?

---

as evidence against him or her; and the right to the presence of an attorney. *State v. Kennedy*, 325 S.C. 295, 303, 479 S.E.2d 838, 842 (Ct.App.1996).

A: Yes.

Q: And how did that occur?

A: At the ... end of this ... situation ... they brought Mr. Lynch over and I proceeded to ... ask him some questions.

Q: And you asked him about the ... situation that took place inside [the Chesterfield Unit]?

A: I believe I asked him about that, you know, what happened in there and also asked him generally speaking, you know, his grievances.

(emphasis added).

Melvins testimony demonstrates he was at Lee Correctional Institution covering the riot as a news reporter and not as an agent of the police. Thus, Lynchs statements to Melvin were not the result of a custodial interrogation.

■ Even if we assumed Melvin acted as an agent of the State at the time he interviewed Lynch, the *Miranda* warnings would be inapplicable. The *Miranda* decision is meant to preserve the privilege against self-incrimination during interrogation of a suspect in a police dominated atmosphere. *Illinois v. Perkins*, 496 U.S. 292, 296, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). The police dominated atmosphere generates inherently compelling pressures which work to undermine the individuals will to resist and to compel him to speak where he would not otherwise do so freely. *Id.* (internal quotations omitted). When an individual speaks to an undercover law enforcement official, *Miranda* warnings are not required. *Id.*

■ Assuming Melvin acted as an agent of the police, Lynch would not have known this. (Coercion is determined from the perspective of the suspect.). *Id.* Rather, Lynch would have perceived Melvin as a reporter covering the prison riot. During Lynchs interview, Melvins questions were of the same nature that any reasonable reporter covering a riot would ask. For example, Melvin asked Lynch what occurred inside the Chesterfield Unit, why the riot occurred, and what Lynchs grievances were. If Melvin was operating as a government agent during the interview, he was doing so in an undercover capacity, thus making the *Miranda* warnings inapplicable. *Id.*

 If we assumed Melvin acted as an agent of the State and Lynch was aware of this, the trial court did not err in refusing to suppress Lynchs statements. The failure to suppress evidence for possible *Miranda* violations is harmless if the record contains sufficient evidence to prove guilt beyond a reasonable doubt. *State v. Easler,* 327 S.C. 121, 129, 489 S.E.2d 617, 621 (1997). The record contains the testimony of numerous eyewitnesses that prove Lynchs guilt beyond a reasonable doubt.

According to Cottons testimony, Lynch stabbed and threatened to kill Cotton on at least three separate occasions. Cotton described Lynch as the leader of the riot. Although Cottons testimony may be deemed as bias, other evidence supports Cottons version.

Numerous correctional officers testified Lynch stabbed and threatened to kill Cotton. Sergeant Wanda Scarborough testified Lynch told her Cotton was being held as a hostage. Lieutenant Robert Johnson testified Lynch threatened to kill Cotton with a homemade shank. Sergeant Cedrick June testified he observed Lynch with a shank, witnessed Cotton handcuffed to Lynch, and saw Lynch stab Cotton in the shoulder twice. Captain Arenda Thomas saw Cotton handcuffed to Lynch and witnessed Lynch stab Cotton. Dozier testified Lynch threatened to kill Cotton. Officer Yvonne Blandshaw testified she observed Cotton handcuffed to Lynch and saw Lynch stab Cotton twice. Officer Cynthia York testified she saw Lynch stab Cotton twice. Major John Ferraro, an expert in hostage negotiation, testified Lynch slapped, punched, and stabbed Cotton. Major Ferraro also testified Lynch threatened to kill Cotton. The overwhelming evidence of Lynchs guilt renders any possible *Miranda* violation harmless.

**B. The trial court did not error by admitting the video tapes.**

 As noted above, Lynch objected to the introduction of videos obtained by the Department of Corrections. These videos were taken during and subsequent to the riot. They depict the state of the Chesterfield Unit after the riot, the negotiations between the inmates and law enforcement officials, and the condition of Lynch's cell.

During the hours of negotiations, Cotton was held in Lynch's cell. The videos portray a bloody rag in Lynch's cell. Lynch argued the videos would inflame the passion of the jury and their prejudicial effect out weighed their probative value. The trial court overruled this objection.

The admission of evidence is within the sound discretion of the trial court. *State v. Pittman,* 373 S.C. 527, 577, 647 S.E.2d 144, 170 (2007). To constitute an abuse of discretion, the conclusions of the trial judge must lack evidentiary support or be controlled by an error of law. *Id.*

Even if the trial court improperly admitted the videos, we find any error in their admission harmless because the videos were cumulative to other evidence which was properly admitted. *State v. Wyatt,* 317 S.C. 370, 372–73, 453 S.E.2d 890, 891 (1995). As explained above, numerous correctional officers testified Lynch stabbed and threatened to kill Cotton. Thus, the trial court did not commit reversible error in admitting the videos.

## CONCLUSION

Accordingly, the trial court's decision is

**AFFIRMED.**[6]

STILWELL and SHORT, JJ., concur.

---

6. We decide this case without oral argument pursuant to Rule 215, SCACR.