758 S.E.2d 195

The STATE, Respondent,

v.

Robert PALMER and Julia Gorman, Appellants.

Appellate Case No. 2011–203707.

No. 5198.

Court of Appeals of South Carolina.

Heard Oct. 9, 2013.
Decided Feb. 12, 2014.
Rehearing Denied April 7, 2014.
Certiorari Granted Sept. 24, 2014.

Appellate Defenders Robert M. Pachak, of Columbia, for Appellant Robert Palmer, and Susan Barber Hackett, of Columbia, for Appellant Julia Gorman.

Attorney General Alan McCrory Wilson and Assistant Attorney General William M. Blitch, Jr., both of Columbia, for Respondent.

FEW, C.J.

Robert Palmer and Julia Gorman were convicted in a joint trial of homicide by child abuse, aiding and abetting homicide by child abuse, and unlawful conduct toward a child, in connec-

tion with the death of Gorman's seventeen-month old grandson. The State proved conclusively that the child died from blunt force head trauma while in the exclusive custody of Palmer and Gorman. Palmer and Gorman contend, however, the trial court erred in denying their directed verdict motions because the State's evidence was insufficient to prove (1) which defendant inflicted the child's injuries, and (2) that either of them aided or abetted the other.[1] We affirm their convictions for homicide by child abuse and unlawful conduct toward a child. However, we find insufficient evidence of aiding and abetting, and therefore, we reverse those convictions. We affirm all other issues pursuant to Rule 220(b), SCACR.

## I. Standard of Review

Our task on appeal is to determine whether the trial court committed an error of law in denying Palmer and Gorman's motions for a directed verdict. *See State v. Cope,* 405 S.C. 317, 334, 748 S.E.2d 194, 203 (2013) ("In criminal cases, the appellate court sits solely to review errors of law."); *State v. Williams,* 405 S.C. 263, 272, 747 S.E.2d 194, 199 (Ct.App.2013) (stating "the appellate court sits to review errors of law only"). Our supreme court recently summarized the standard we employ in reviewing a trial court's decision to deny a motion for a directed verdict:

In cases where the State has failed to present evidence of the offense charged, a criminal defendant is entitled to a directed verdict. During trial, when ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight. The trial court should grant the directed verdict motion when the evidence merely raises a suspicion that the accused is guilty, as suspicion implies a belief or opinion as to guilt based upon facts or circumstances which do not amount to proof. On the other hand, a trial judge is not required to find that the evidence infers guilt to the exclusion of any other reasonable hypothesis.

On appeal, when reviewing a denial of a directed verdict, this Court must view the evidence and all reasonable infer-

---

1. We consolidated their appeals pursuant to Rule 214, SCACR.

ences in the light most favorable to the state. *See State v. Mitchell*, 341 S.C. 406, 409, 535 S.E.2d 126, 127 (2000) (finding that when ruling on cases in which the state has relied exclusively on circumstantial evidence, appellate courts are likewise only concerned with the existence of the evidence and not its weight). If the state has presented ... substantial circumstantial evidence reasonably tending to prove the guilt of the accused, this Court must affirm the trial court's decision to submit the case to the jury. *Cf. Mitchell*, 341 S.C. at 409, 535 S.E.2d at 127 ("The trial judge is required to submit the case to the jury if there is 'any substantial evidence which reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced.' ") (emphasis removed) (citation omitted).

*State v. Hepburn*, 406 S.C. 416, 429, 753 S.E.2d 402, 408–09 (2013) (some citations and internal quotation marks omitted).

## II. Facts and Procedural History

On July 2, 2008, the child's mother—Gorman's daughter—left the child in Palmer and Gorman's custody under a temporary guardianship.[2] On the evening of July 14, 2008, Gorman made a 911 call from her home reporting the child had "shortness of breath." A member of the Horry County Fire and Rescue team testified that when he arrived at Gorman and Palmer's home, the child was seizing and in "a pretty grave condition." A doctor who treated the child at Conway Medical Center testified the child showed signs of "severe neurological injury," the cause of which "would have to be tremendous force to the skull." A CT scan of the child's head revealed skull fractures and swelling of the brain, which the doctor indicated "raise[d] the concern of child abuse." Due to the severity of the injuries, the child was flown to the Medical University of South Carolina (MUSC), where he was kept on life support for two days. His parents decided to cease support, and the child died July 16, 2008.

A forensic pathologist performed an autopsy on the child and found skull fractures on both sides of the child's head.

---

2. The child's mother left town to visit her husband, the child's father, who was stationed out-of-state on military duty.

She concluded the child died from blunt force head trauma, and the manner of death was homicide.

## A. Palmer's and Gorman's Statements to Police

On July 18, 2008, Palmer and Gorman gave statements to the police. Palmer told police he did not know what happened to the child and denied hurting him. Similarly, Gorman told police she did not know how the injury occurred, but neither she nor Palmer hurt the child.

When asked whether the child's injuries could have been caused by being shaken, Gorman denied ever shaking the child. However, after the police continued to question her, she admitted she may have shaken the child and demonstrated how she shook him. She stated she did not think she shook him hard and denied shaking him the day he went to the hospital.

Palmer and Gorman both gave police a timeline of what occurred the day of July 14. According to Gorman's statement, she checked on the child at approximately 5:30 a.m. before she left for work and found him sleeping. According to Palmer's statement, he woke the child at 9:30 a.m., fed him breakfast and lunch, then laid the child down for a nap at 3:30 p.m. Gorman confirmed this, stating Palmer called and told her that he fed the child in the morning and again around noon. Gorman and Palmer both stated Palmer was alone with the child all day while Gorman was at work.

Gorman arrived home between 4:00 and 4:30 p.m. Gorman claimed she checked on the child as soon as she got home, and, similarly, Palmer stated he and Gorman walked to the "edge of the door" and "peeked in" the child's room to check on him. Gorman stated the child "was breathing fine, everything was fine." She also told police that "a little bit later," she and Palmer checked on him again and "still everything was fine." Palmer's statement, however, does not mention that they checked on the child a second time. Instead, he claims they went outside to talk "for a little bit" and then Gorman prepared dinner, which they ate around 6:00 p.m.

Gorman told police that after dinner, Palmer took the dog outside while she went to wake the child. Palmer did not mention walking the dog, but only that after dinner, Gorman

went to check on the child. According to Gorman, when she entered the child's room, she heard him making "really strange noises" and noticed he was "slack looking," with saliva coming from his mouth. She claimed she picked him up and "leaned him over [her] arm because [she] didn't know if he was choking or if he was going to throw up." She called out to Palmer that something was wrong. Palmer came to her and discovered the child was having a seizure. Gorman called 911 while Palmer held the child.

## B. Medical Evidence

At trial, the State introduced medical experts who testified to the extent of the child's injuries. Dr. Donna Roberts, a neuro-radiologist with MUSC, testified the child had skull fractures on both sides of his head, which resulted from severe trauma that occurred the day the child arrived at the hospital. She testified it "required severe force to create [the skull fractures]," and likened it to falling from a three-story window or being involved in a car accident. She stated the fractures could not have been caused by merely shaking the child. She also testified a person with these injuries "would be immediately severely symptomatic" and display a loss of consciousness, alteration in breathing, seizures, and foaming at the mouth.

The State also called Dr. Ann Abel, the director of the Violence Intervention and Prevention Division in the pediatric department of MUSC, who testified that she spoke with Gorman and Palmer at MUSC to gain more information about the child. She claimed they both denied that any injury or accident occurred the day the child went to the hospital. Medical evidence, however, indicated the injuries must have occurred sometime that day. Dr. Abel testified that, in her medical opinion, the head injury occurred no more than three hours before the child arrived at the hospital.

Dr. Abel further testified the child suffered "massive" blows to both sides of the head that could have been inflicted in "less than a minute." She stated that a person observing the injuries take place "would perceive that this was a tremendous force" inflicted upon the child. However, she also testified that a person who did not see the force applied may not appreciate that something had happened to the child. She

explained a person may be unable to discern whether the child was sleeping or unconscious if the person was not aware the head trauma had occurred.

Three of the State's witnesses testified they noticed bruises on the child while he was in the hospital, and Gorman could not account for them in her testimony. Dr. Abel testified the child had multiple bruises in places that were atypical for "normal childhood falling." Similarly, one of the nurses who treated the child in the emergency room testified she saw bruises on the child's body that "you wouldn't [typically] see." Additionally, a Department of Social Services employee investigating the case observed dark bruises on the child at the hospital, and when she asked Gorman how the bruising occurred, she responded the child "liked to pinch himself." However, the child's mother testified that, to her knowledge, the child had never intentionally hurt or pinched himself. Regarding whether the bruises were recently inflicted, Dr. Jody Hutson, the child's primary care physician, testified that when he saw the child on July 1 for ant bites and allergies and again on July 8 to administer vaccinations, the child had no bruises or any other injuries that would cause him to suspect child abuse. Furthermore, Palmer's parents testified that when the child came to their house to swim on July 13—the day before his injuries occurred—they did not notice any bruises on him.

### C. Gorman's Trial Testimony

All of the evidence described above was presented by the State in its case in chief. Both Palmer and Gorman presented evidence at trial, although Palmer did not testify. Under the waiver rule recognized by this court in *State v. Harry*, 321 S.C. 273, 468 S.E.2d 76 (Ct.App.1996), and recently confirmed by our supreme court in *Hepburn*, this court properly considers evidence presented by defendants unless an exception to the waiver rule applies. *See Hepburn*, 406 S.C. at 430 n. 15, 431–34, 753 S.E.2d at 409 n. 15, 410–11 (providing that when a defendant presents evidence, "the 'waiver doctrine' requires the reviewing court to examine all the evidence rather than to restrict its examination to the evidence presented in the [State's] case-in-chief" (citation omitted)); *Harry*, 321 S.C. at 277, 468 S.E.2d at 79 (stating "when the defendant presents

testimony, he loses the right to have the court review the sufficiency of the evidence based on the state's evidence alone"). Neither Palmer nor Gorman argue any exception applies, and we find none applies.

Gorman testified at trial to a timeline of events that occurred on July 14, parts of which contradicted her statement to police. A time card introduced in evidence showed she clocked out from work at 3:45 p.m. Gorman testified she drove home immediately after leaving work, which took around forty-five minutes. When she arrived home at approximately 4:40 p.m., she "walked to the [child's] bedroom door" and saw the child was asleep. Although Gorman and Palmer's statements to police do not indicate that Gorman left the house after checking on the child, Gorman introduced a check she signed made payable to a grocery store that was dated July 14 and had a time stamp of 3:52 p.m. Gorman explained she had forgotten to tell the police she went to the grocery store after checking on the child. Gorman claimed, however, that it was impossible for her to clock out of work at 3:45 p.m. and be at the grocery store by 3:52 p.m. She stated, though, it was "fair to say that maybe [she] cashed th[e] check at 4:52 p.m.," and the time stamp was off by one hour. While she was at the grocery store, Palmer stayed at home with the child.

According to Gorman's testimony, when she returned from the store, she did not check on the child again but instead began cooking dinner. She told the jury that when she and Palmer finished eating, she walked to the child's bedroom to wake him. When asked where Palmer was when she went to wake the child, Gorman testified that "at one point he took the dog outside to use the bathroom" but stated "he could have been already back inside the house." She went on to testify that when she discovered the child was injured and called out to Palmer, he arrived in the child's room in "seconds."

Gorman testified at trial she had never shaken the child. When asked why she demonstrated to police how she shook the child, she responded she "was just so tired and drawn out" that she "just reacted."

### D. Directed Verdict Motions, Verdict, and Sentence

Palmer and Gorman both moved for directed verdicts on all charges, which the trial court denied. The jury found both

Gorman and Palmer guilty of all charges. The court sentenced them each to ten years for unlawful conduct toward a child, twenty years for aiding and abetting, and thirty-five years in prison for homicide by child abuse, all to run concurrently.

## III. Palmer's and Gorman's Directed Verdict Motions

Palmer and Gorman both assert the trial court erred in denying their directed verdict motions because the State did not present substantial circumstantial evidence to prove identity—whether it was Palmer or Gorman who inflicted the injuries that caused the child's death. They also assert the State did not prove that Palmer or Gorman aided and abetted the other in committing homicide by child abuse.

### A. Homicide by Child Abuse

Subsection 16-3-85(A)(1) of the South Carolina Code (2003) provides that a person is guilty of homicide by child abuse when he or she "causes the death of a child ... while committing child abuse." "Child abuse" is defined as "an act or omission by any person which causes harm to the child's physical health or welfare," S.C.Code Ann. § 16-3-85(B)(1) (2003), and "harm" occurs when a person "inflicts or allows to be inflicted upon the child physical injury." § 16-3-85(B)(2)(a).

The State conclusively established by direct medical evidence that the child's fatal injuries were the result of child abuse. This evidence consisted of the following trial testimony: (1) the child died from intentionally inflicted blunt force trauma to the head; (2) the child suffered two skull fractures caused by "massive" blows to each side of the head, and exhibited multiple dark bruises that were atypical for "normal childhood falling"; and (3) the force used to inflict the skull fractures was comparable to falling from a three-story window or being involved in a car accident.

The State also conclusively established by direct evidence that the child's injuries occurred sometime on July 14. Both of the State's medical experts testified the injuries occurred that day. In fact, Dr. Abel testified the head injuries occurred within three hours before the child was taken to the hospital.

The State relies entirely on circumstantial evidence, however, to prove who inflicted the injuries that killed the child. Because the child was in the exclusive custody of Palmer or Gorman, or both, during the time in which his injuries occurred, the jury could reasonably infer that either Palmer or Gorman, or both Palmer and Gorman, inflicted the child's injuries.

## 1. Evidence of Gorman's Guilt

█ We find the trial court correctly denied Gorman's motion for a directed verdict because there is substantial circumstantial evidence that she inflicted at least one of the child's injuries—specifically, while she was alone in his bedroom after dinner. Dr. Robert's testimony established the child would be "immediately severely symptomatic" after receiving the injuries and incapable of normal functioning, i.e., eating, walking, or playing. According to Gorman's statement to police, she observed nothing abnormal about the child when she left for work at 5:30 a.m. Similarly, Palmer told police the child functioned normally during the day—he ate breakfast and lunch and played. When Gorman returned home from work between 4:00 and 4:30 p.m., she claimed the child "was breathing fine, everything was fine," and when she checked on him again "a little bit later" with Palmer, "still everything was fine." Although she contradicted herself on this point at trial, Gorman's statement suggests Palmer was not alone with the child after she returned from work. Gorman entered the child's room to wake him around 6:00 p.m. that evening, and at 6:06 p.m., Gorman called 911 to report the child's symptoms. From this evidence, the jury could have "fairly and logically deduced" that Gorman inflicted the fatal injuries. *See Hepburn*, 406 S.C. at 429, 753 S.E.2d at 409 ("The trial judge is required to submit the case to the jury if there is any substantial evidence which reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced." (quoting *Mitchell*, 341 S.C. at 409, 535 S.E.2d at 127)).

## 2. Evidence of Palmer's Guilt

█ We find the trial court also correctly denied Palmer's motion for a directed verdict because there is substantial

circumstantial evidence that Palmer inflicted at least one of the child's injuries. There are two scenarios under the evidence that reasonably tend to prove Palmer's guilt. First, the evidence supports that Palmer injured the child while Gorman was at work. Palmer had the child in his care the entire day of July 14. Though Gorman stated the child was sleeping "and breathing fine" when she returned from work, Dr. Abel testified a person may be unable to differentiate a sleeping child from one who is unconscious. Thus, the child's injuries might not have been noticeable to her at this time, particularly given Gorman's testimony that she did not actually enter the child's room or go close enough to carefully observe the child.

As to the second scenario, Palmer could have injured the child while Gorman was at the grocery store. The time stamp on Gorman's check established that she went to the grocery store that evening, and according to her trial testimony, Palmer stayed at home with the child. She testified that when she returned from the store, she did not check on the child. From this evidence, the jury could have "fairly and logically deduced" that Palmer inflicted the fatal injuries. *See id.*

### 3. Other Circumstances of Guilt

The State also presented evidence at trial from which it argued the jury could infer "why someone would kill a seventeen-month old child." While this evidence is insufficient by itself to prove Palmer or Gorman's guilt, the evidence must be considered in combination with all the evidence to determine whether there is substantial circumstantial evidence of guilt. *See State v. Frazier,* 386 S.C. 526, 532, 533, 689 S.E.2d 610, 613, 614 (2010) (viewing circumstantial evidence "collectively" and "as a whole" to hold directed verdict properly denied); *State v. Cherry,* 361 S.C. 588, 595, 606 S.E.2d 475, 478 (2004) (finding the circumstantial evidence, when combined, was "sufficient for the jury to infer [guilt]"). Because the State relied on the evidence at trial, we summarize it here.

This evidence relates primarily to Gorman, and includes (1) evidence that Gorman was often frustrated and annoyed with the child's behavior because, as Gorman testified, he "crie[d] every day, [was] cranky every day, whine[d] every day;"[3] (2)

---

3. Gorman told Dr. Abel the child was "clingy and whiny and want[ed] to be held all the time." Similarly, a paramedic testified Gorman told

evidence that Gorman disliked the child, shown through comments she made to others; (3) testimony that Gorman and Palmer were "stressed about money" and concerned about how the child would affect their financial problems; (4) Gorman's testimony that she did not have a good relationship with the child's mother; (5) Gorman's testimony that she had never met the child before the child's mother left him with Gorman; and (6) Gorman's admission to shaking the child on a previous occasion.

As to Palmer, the State showed he was only thirty years old, unemployed, and experiencing financial difficulty at the time the child came to live with them. Palmer's father testified Palmer had a five-year old son who lived with Palmer's father and mother most of the time because he "didn't think that [Palmer] had any time for [the child]." Palmer's mother testified she and her husband "basically raise[d]" Palmer's son. Based on this evidence, the State theorized Palmer did not want to take on the responsibility of caring for a child, particularly one that was not his own.

#### 4. Palmer's and Gorman's Statements

In Palmer's and Gorman's statements to police, they both deny causing the child's injuries and deny any knowledge of the other doing so. From the medical evidence and testimony presented at trial, however, it is not possible that both of these statements are true. While we are careful not to consider the falsity of a defendant's statement as positive evidence of the defendant's guilt, we find the impossibility that both statements are true is a circumstance the jury was entitled to consider in determining the guilt of both parties. Likewise, it is evidence the trial court and this court may properly consider in determining whether there is substantial circumstantial evidence of each defendant's guilt.

#### 5. Concerns Related to Proving the Identity of the Principal

Because these cases were tried jointly, we necessarily merged the evidence presented as to Palmer and Gorman into

---

her that "she's raised several children in her lifetime and never seen such a bad one."

one discussion. This necessity highlights the difficulty of the question presented by this appeal—whether the evidence the State presented as to each defendant eliminates the possibility that the other defendant inflicted all of the injuries that killed the child. The essence of Palmer and Gorman's argument on appeal is the evidence does not eliminate that possibility. We agree it does not. However, we find the State presented substantial circumstantial evidence of each defendant's guilt on the charge of homicide by child abuse.

■ This court "sits solely to review errors of law," *Cope*, 405 S.C. at 334, 748 S.E.2d at 203, and therefore we must confine *our* decision to whether the trial court correctly made *its* decision. As the supreme court stated in *Hepburn*, "we are called by our standard of review to consider the evidence as it stood" when the trial court made the ruling that is now on appeal.[4] 406 S.C. at 442, 753 S.E.2d at 416. In denying the defendants' directed verdict motions, the trial court considered the evidence as it stood at that time in regard to each individual defendant, and determined whether that evidence was sufficient to support each charge against each defendant. The possibility that the jury may later reach verdicts that are inconsistent between the defendants was outside the trial court's power to consider, as that would require the court to weigh the strength of the case against one defendant in considering the sufficiency of the evidence against the other. *See Hepburn*, 406 S.C. at 428, 753 S.E.2d at 408 ("When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight." (quoting *Cherry*, 361 S.C. at 593, 606 S.E.2d at 477–78)); *State v. Garrett*, 350 S.C. 613, 619, 567 S.E.2d 523, 526 (Ct.App.2002) (stating our case law prohibits "inconsistent verdicts when multiple offenses are submitted to the jury, not when the jury

---

4. We recognize the supreme court made this statement to indicate it was not considering evidence presented after the State rested its case in chief. However, the reasoning of the court applies here. The statement indicates a reviewing court must identify a point in time where its review is focused for the purposes of determining error. In this case, the relevant point in time is when the trial court ruled on the directed verdict motion at the close of all evidence. We must analyze whether the trial court erred based on the evidence that was before it at that time, not retrospectively after the jury returned a verdict based on that evidence.

returns disparate results for co-defendants"). As the trial court was required to do, we independently analyze the evidence against each defendant. Because that independent review of the evidence as to each defendant reveals "substantial evidence which reasonably tends to prove the guilt of the accused, [and] from which his guilt may be fairly and logically deduced," *Hepburn*, 406 S.C. at 429, 753 S.E.2d at 409, we affirm the trial court's denial of each defendant's motion for a directed verdict for homicide by child abuse.[5]

## B. Unlawful Conduct Toward a Child

 We also find the evidence discussed above as to Palmer and Gorman supports the trial court's refusal to grant their directed verdict motions on the charge of unlawful conduct towards a child. *See* S.C.Code Ann. § 63–5–70(A)(2) (2010) (making it unlawful for a child's guardian to "do or cause ... any bodily harm to the child so that the life or health of the child is endangered").

## C. Aiding and Abetting Homicide by Child Abuse

 Under subsection 16–3–85(A)(2) of the South Carolina Code (2003), a person is guilty of aiding and abetting homicide by child abuse when he or she "knowingly aids and abets another person to commit child abuse or neglect ... [that] results in the death of a child." "Aid and abet" is defined as to "[h]elp, assist, or facilitate the commission of a crime," which can be rendered by "words, acts, encouragement, support, or presence, actual or constructive." *State v. Smith*, 359 S.C. 481, 491, 597 S.E.2d 888, 894 (Ct.App.2004) (quoting *Black's Law Dictionary* 68 (6th ed.1990)). "To be guilty as an aider or abettor, the participant must have knowledge of the principal's criminal conduct." *State v. Zeigler*, 364 S.C. 94, 107, 610 S.E.2d 859, 866 (Ct.App.2005). Thus,

---

5. The dissent relies on *Hepburn* as to the sufficiency of the evidence in this case. While we rely on *Hepburn* as to our standard of review, we find it distinguishable on the facts. In *Hepburn*, the supreme court found the State did not present sufficient evidence that Hepburn inflicted the child's injuries, stating, "Every State witness placed [Hepburn] asleep at the time the victim sustained the fatal injuries." *Id.* at 440, 753 S.E.2d at 415. Based on this, the court concluded no inference could be drawn "that *Appellant* harmed the victim." *Id.*

"[m]ere presence at the scene is not sufficient to establish guilt as an aider or abettor." *State v. Mattison*, 388 S.C. 469, 480, 697 S.E.2d 578, 584 (2010) (citation omitted).

█ While the State's evidence conclusively proved the child died from child abuse, we find the State presented no direct evidence and insubstantial circumstantial evidence that either Palmer or Gorman knowingly undertook any action to aid or abet that abuse. Therefore, the trial court erred in denying Palmer's and Gorman's motions for a directed verdict on aiding and abetting. *See State v. Lewis*, 403 S.C. 345, 355–57, 743 S.E.2d 124, 129–30 (Ct.App.2013) (reversing denial of directed verdict motion when evidence was insufficient to prove the defendant knowingly undertook an overt act to aid and abet his codefendant in committing homicide by child abuse).

The State contends *State v. Smith* controls and requires us to affirm. The supreme court's discussion of *Smith* in *Hepburn*, however, defeats the State's argument. *See Hepburn*, 406 S.C. at 440–42, 753 S.E.2d 415–16. As it relates to aiding and abetting, the key facts in *Smith* were that the defendants were never separated during the time the medical evidence proved the injuries occurred, and "the medical testimony indicated that the victim['s] ... symptoms would have been severe and immediate, and importantly, obvious to both Smith and the victim's mother very soon after the injuries were inflicted." *Hepburn*, 406 S.C. at 441, 753 S.E.2d at 415 (quoting and citing *Smith*, 359 S.C. at 491–92, 597 S.E.2d at 894). Here, Palmer and Gorman were separated for periods of time in which the injury could have occurred, and Dr. Abel testified the injuries may not have been apparent to someone who did not see them inflicted. Thus, we find this case distinguishable from *Smith*.

## IV. Other Issues on Appeal

As to all other issues on appeal, we affirm pursuant to Rule 220(b), SCACR, and the following authorities:

█ Regarding Palmer's argument that the State violated its agreement with him, we find it is not a "proffer agreement." *See United States v. Gillion*, 704 F.3d 284, 292 (4th Cir.2012) (defining a "proffer agreement" as an agreement "intended to protect the defendant against the use of his or

her statements," particularly when "the defendant has revealed incriminating information and the proffer session does not mature into a plea agreement"). Regardless of this finding, we affirm on the basis that Palmer failed to demonstrate how enforcement of the agreement would affect him.

■■■■■■ Turning to the issues raised by Gorman on appeal, we find the following:

(1) We find Gorman did not preserve for our review her argument that any statements she gave before being advised of her constitutional rights are inadmissible under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The record reflects Gorman objected only to the voluntariness of her statement at the *Jackson v. Denno*[6] hearing and renewed this initial objection at trial. Because Gorman did not allege a *Miranda* violation before or during trial, she cannot do so now. *See State v. Wise*, 359 S.C. 14, 21, 596 S.E.2d 475, 478 (2004) (stating an issue not raised to and ruled upon by the trial court is not preserved).

(2) Gorman asserts that any statements given after she waived her *Miranda* rights are tainted by the initial violation—being subjected to custodial interrogation without first being given her *Miranda* warnings—and are thus inadmissible. *See State v. Peele*, 298 S.C. 63, 65, 378 S.E.2d 254, 255 (1989) (requiring police to advise suspects of their *Miranda* rights before initiating "custodial interrogation"); *State v. Lynch*, 375 S.C. 628, 633, 654 S.E.2d 292, 295 (Ct.App.2007) (stating the State may not use statements gained from custodial interrogation in violation of *Miranda*). We find, however, the police did not interrogate Gorman before giving her *Miranda* rights and thus no *Miranda* violation occurred. *See Lynch*, 375 S.C. at 633, 654 S.E.2d at 295 (stating *Miranda* rights attach only when the suspect is subjected to custodial interrogation); *State v. Kennedy*, 333 S.C. 426, 431, 510 S.E.2d 714, 716 (1998) (defining interrogation as "express questioning, or its functional equivalent," consisting of words or actions by police that "are reasonably likely to elicit an incriminating response"); *State v. Franklin*, 299 S.C. 133, 136, 382 S.E.2d 911, 913 (1989) (holding defendant's statements to police were not the product of interrogation and were thus admissible).

---

6. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

(3) Gorman asserts her statement is inadmissible because it was not voluntarily given. *See Franklin*, 299 S.C. at 137, 382 S.E.2d at 913 ("The test of admissibility of a statement is voluntariness."). In finding the statement was voluntary, the trial court evaluated the totality of the circumstances and made the requisite findings. *See State v. Dye*, 384 S.C. 42, 47, 681 S.E.2d 23, 26 (Ct.App.2009) (stating voluntariness of a statement is determined by examining the totality of circumstances surrounding the statement, including "background, experience, conduct of the accused, age, length of custody, . . . [and] threats of violence"). We affirm because each of these findings is supported by the record. *See State v. Saltz*, 346 S.C. 114, 136, 551 S.E.2d 240, 252 (2001) (requiring appellate courts to review a ruling concerning voluntariness under an "any evidence" standard).

## V. Conclusion

We affirm the trial court's refusal to grant Palmer's and Gorman's directed verdict motions on the charges of homicide by child abuse and unlawful conduct toward a child, but reverse as to aiding and abetting homicide by child abuse. We affirm any other issues on appeal.

**AFFIRMED IN PART, REVERSED IN PART.**

KONDUROS, J., concurs.

PIEPER, J., concurring in part and dissenting in part.

I concur in the majority's decision to reverse Gorman and Palmer's convictions for aiding and abetting homicide by child abuse, as there was insufficient evidence that they were acting together or assisting one another. I also would find there was insufficient evidence of the codefendants' guilt for homicide by child abuse and unlawful conduct toward a child because the State did not present any direct or substantial circumstantial evidence to reasonably prove which codefendant harmed the child. *See State v. Lane*, 406 S.C. 118, 121, 749 S.E.2d 165, 167 (Ct.App.2013) ("The State has the burden of proving beyond a reasonable doubt the identity of the defendant as the person who committed the charged crime or crimes."). The evidence establishes that Gorman and Palmer each had time alone with the child during the timeframe of the abuse, and

therefore, the State has only demonstrated that each defendant had an opportunity to injure the child. Utilizing the analysis of the supreme court in *State v. Hepburn*, 406 S.C. 416, 438–42, 753 S.E.2d 402, 413–15 (2013) and *State v. Lewis*, 403 S.C. 345, 352–56, 743 S.E.2d 124, 128–29 (Ct.App.2013), I would find the only inference that can be fairly and logically deduced from the evidence is that one of the two codefendants inflicted the child's injuries. *See Hepburn*, 406 S.C. at 440, 753 S.E.2d at 415 ("While undoubtedly present at the scene, the only inference that can be drawn from the State's case is that one of the two [codefendants] inflicted the victim's injuries, but not that *Appellant* harmed the victim. Thus, we reverse the trial court's refusal to direct a verdict of acquittal because the State did not put forward sufficient direct or substantial circumstantial evidence of Appellant's guilt." (emphasis in original)); *Lewis*, 403 S.C. at 354–56, 743 S.E.2d at 129 (reversing the defendant's conviction when the State failed to offer any direct evidence or substantial circumstantial evidence of the defendant's guilt and the defendant's involvement amounted to mere presence at the scene). Accordingly, I would find the trial court erred by denying the defendants' directed verdict motions, and I would reverse the convictions for homicide by child abuse and unlawful conduct toward a child.