# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent/Petitioner,

v.

Robert Palmer, Petitioner/Respondent.

Appellate Case No. 2014-000954

and

The State, Petitioner/Respondent,

v.

Julia Gorman, Respondent/Petitioner.

Appellate Case No. 2014-001008

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Horry County
Larry B. Hyman, Jr., Circuit Court Judge

---

Opinion No. 27552
Heard June 17, 2015 – Filed July 29, 2015

---

## AFFIRMED IN PART; REVERSED IN PART

---

Attorney General Alan McCrory Wilson and Assistant
Attorney General William M. Blitch, Jr., both of
Columbia, for Petitioner/Respondent.

Appellate Defender Robert M. Pachak, of Columbia, for
Respondent/Petitioner, Robert Palmer.

Appellate Defender Susan Barber Hackett, of Columbia,
for Respondent/Petitioner, Julia Gorman.

---

**JUSTICE PLEICONES:**  Petitioners Julia Gorman and Robert Palmer were tried jointly for the death of Gorman's seventeen month-old grandson (victim).  Palmer and Gorman, who lived together but were not married, were each convicted of homicide by child abuse (homicide), aiding and abetting homicide by child abuse (aiding and abetting), and unlawful conduct towards a child (unlawful conduct).  On direct appeal, the Court of Appeals reversed both Palmer's and Gorman's aiding and abetting convictions, and a majority affirmed both petitioners' homicide and unlawful conduct convictions.  *State v. Palmer*, 408 S.C. 218, 758 S.E.2d 195 (Ct. App. 2014).  Judge Pieper dissented, and would have reversed all of the petitioners' convictions on the ground "the State did not present any direct or circumstantial evidence to reasonably prove which codefendant harmed the child."  We granted both petitioners' and the State's petitions for writs of certiorari to review the directed verdict issues.[1]  We affirm the Court of Appeals' reversal of both aiding and abetting convictions, and affirm the decision to uphold the denial of Gorman's homicide and unlawful conduct directed verdict motions.  We reverse the Court of Appeals' affirmance of Palmer's convictions for homicide and unlawful conduct finding he was entitled to a directed verdict on both charges.

---

[1] While we also granted Palmer's petition to review a proffer issue, Palmer did not brief the proffer issue on certiorari and it is therefore deemed abandoned.  *See* Rule 208(b)(1)(D), SCACR; *see also Wright v. Craft*, 372 S.C. 1, 640 S.E.2d 486 (Ct. App. 2006).

# FACTS

The only contested issues here are the identity of the individual who harmed the victim and whether the other individual was aware of the abuse. Since this matter involves directed verdict questions, we begin with a review of the evidence in the light most favorable to the State. *E.g. State v. Buckmon*, 347 S.C. 316, 555 S.E.2d 402 (2001). In our review we rely solely on evidence from the State's case-in-chief in order to avoid any of the directed verdict issues that can arise when jointly tried codefendants blame each other in their defense cases. *See State v. Hepburn*, 406 S.C. 416, 753 S.E.2d 402 (2013) (waiver rule bars consideration of codefendant's testimony in reviewing denial of mid-trial directed verdict motion). Here, Gorman testified in her own defense and stated that Palmer was alone with the victim during the time when the fatal injury must have been inflicted. We do not rely on her trial testimony because it cannot be used against Palmer, and because no evidence adduced in the defense cases are necessary to a determination whether Gorman's directed verdict motions were properly denied.

The evidence shows Gorman's eighteen year-old daughter Cesalee traveled by bus to South Carolina with her child, the victim, in late June 2008. Cesalee and her mother had a difficult relationship and had long been estranged. On July 2, Cesalee flew back to her home in Arizona, leaving the victim in the petitioners' care. While there was overwhelming evidence that Gorman agreed to keep the victim while Cesalee packed her family's belongings for a move to the East Coast, Gorman told several people after the victim's injuries that Cesalee had abandoned the victim to her.

On July 1, the victim was taken to the doctor's office by Cesalee and Gorman, suffering from ant bites and allergies. He was prescribed a cream for the bites and a liquid antihistamine (Xyzal) for his allergies. The prescribed dosage for the Xyzal, which has a sedative effect, was 0.5 teaspoon per day. An appointment was set for July 8 so that he could receive immunizations. On July 7, after Cesalee had returned to Arizona, Gorman took the victim to the emergency room reporting he was suffering from projectile vomiting. The victim was observed, given a Pedialyte popsicle, and released.

When Gorman brought the victim back to the family practitioner on July 8, the office was aware of the emergency room visit the night before. The family practitioner examined the victim, determined he had recovered from the bites, the allergies, and the nausea, and administered the vaccinations. She testified that she had examined the victim's head as part of the check-up and had no concerns, and

also that while the victim was small for his age he was not malnourished. The doctor also testified she had no concerns about child abuse when she saw the victim in July.

Gorman repeatedly told medical personnel the victim was lethargic, and Palmer's statements also indicated the victim was not an energetic toddler. There was evidence from which a jury could find the victim's lethargy after July 1, when he was prescribed the sedating Xyzal, was attributable to Gorman's overdosing. At the emergency room visit on July 7, Gorman told medical personnel the victim was being given 1.5 teaspoons of Xyzal per day rather than the 0.5 teaspoons he had been prescribed. After the victim was fatally injured on July 14, Gorman told an emergency room (ER) nurse that the victim had been on Xyzal, and that she had been administering a dose of 2.5 teaspoons, five times the prescribed amount. In this statement, Gorman said the last dose had been given at 9:00 pm on July 11. On the other hand, while en route to the hospital on the 14th, Gorman told the EMT she had given the victim Xyzal on the 14th. The family doctor testified that when she saw the victim on July 8, he was no longer in need of this antihistamine.

On July 14, Gorman went to work, arriving at about 6:00 am, leaving Palmer alone with the sleeping victim. There was evidence that the victim was tired all day, and somewhat whiney. He ate breakfast and lunch, but according to Palmer, having been awakened at about 9:30 am, the victim did not fall asleep again until about 3-3:30 pm. Gorman arrived home around 4:00 pm. Gorman stated she went straight into the victim's room to check on him as she normally did when she first got home, and saw him sleeping soundly and breathing normally. Later she and Palmer checked on him from the doorway. Palmer agreed that they had checked on the sleeping victim from the doorway after Gorman arrived home, and that no one checked on him again until after they had eaten dinner around 6:00 pm. Both petitioners maintained that after dinner Gorman returned to the bedroom alone, and she told officers she found the victim "slack," making "really strange noises," and with saliva at his mouth. She picked him up, and brought him to Palmer. Palmer said the victim was limp but seizing intermittently, with his fists balled up. Gorman agreed the victim was fine until she alone checked on him around 6:00 pm.

Horry County Fire and Rescue were dispatched at 6:07 pm following a 9-1-1 call made by Gorman, and arrived at the home at 6:13 pm. When they arrived, Palmer was holding the victim who was actively seizing and whose "pretty grave" condition was immediately apparent. Petitioners told the responder the victim had

not been sick and had been found in this condition during a nap.  The responder started an I.V. and gave oxygen, noting the victim was making unusual breathing sounds.  EMS paramedics took over at 6:20 pm when the first responder brought the victim to their ambulance as it arrived.  The victim was still seizing and 'posturing,' an involuntary movement where the limbs extend and retract that only occurs in intracranial injury cases.  He also exhibited a "right side gaze," with his eyes pointing towards the injured side of the brain.  His pupils were dilated but responded sluggishly and the seizures stopped as Valium was administered.

The EMS medic testified Gorman rode in the front of the ambulance to the hospital.  Gorman said the victim had not been sick recently and had not fallen, but that she had given him a dose of Xyzal that day.  Gorman told her about the ant bites and stated the victim had been whiney and lethargic since then.  She also made a statement which the medic paraphrased as "She's raised several children in her lifetime and never seen such a bad one."  When the ambulance arrived at the hospital at about 7:00 pm, the victim was still posturing, his right-side gaze had not changed, his pupils were more dilated, he was still breathing very rapidly, and his heart rate was elevated.

The ER nurse testified that on arrival the victim was unresponsive, posturing, seizing, and had dilated pupils.  Gorman responded to the nurse's questions.  She said the victim had not fallen or hit his head on anything before the seizures started.  She also told the ER nurse that he was on Xyzal, but she had not given him any since administering 2.5 teaspoon on July 11.  The nurse observed Palmer was very concerned and wanted to talk to and touch the seizing victim, in contrast to Gorman's behavior.

The ER nurse testified that upon the victim's arrival at the Conway Hospital at 7:02 pm  another nurse had scored the victim at a 5 on the Glasgow Coma Score.  At 8:30 pm his score had dropped to a 3.  The scale runs from 15 to 3, and anything below a 9 is "gravely concerning."  The victim's breathing was labored and grunting, and the nurse testified that human life cannot be maintained at that level of effort.  His heart rate never dropped below 142, when a normal rate would have been 110 to 115.  The ER nurse watched as the C.A.T. scan was performed, immediately saw the skull fractures, and some bleeding at the back of the brain, and called the ER doctor.  She testified the fractures and bleeding were consistent with violent trauma, and she also observed some abnormal bruising on the victim's body.  Palmer reported the victim had been dragging his foot earlier in the day.  Gorman told the nurse the victim's mother was a drug addict who dropped the

victim off and whose whereabouts were unknown.  The victim, who was very thin, remained at the Conway Hospital from 6:58 pm until he was helicoptered to the Medical University of South Carolina (MUSC) in Charleston at 10:33 pm.

The Conway ER doctor testified the victim arrived "in extremist [sic] immediately evident" "showing signs of a severe neurological injury."  The victim appeared to be breathing on his own but was posturing.  He was immediately intubated to maintain breathing.  The C.A.T. scan showed severe trauma to the skull and brain such that "impending death is what it [sic] was concerned."  The brain had hemorrhages and edema and there was a loss of gray-white matter distinction indicating the death of brain tissue.

The victim's father arrived in Charleston from Virginia on Monday, July 15, after Gorman called him during the evening of July 14 to say the victim was being airlifted to MUSC.  After this conversation, the father called to speak to the doctor at the Conway Hospital, and based on that conversation, the father filed a police report.  The father called Cesalee in Arizona but neither Palmer nor Gorman had tried to reach her.  Cesalee flew to Charleston, and after consulting with the doctors who told them only machines were keeping the victim alive, the parents had him baptized and then donated his organs.  The victim was removed from life support on July 16.

A MUSC neuro-radiologist testified as an expert witness, having examined the medical reports and C.T. scans performed at Conway Hospital on July 14 and at MUSC on July 15.  Those scans showed the victim suffered comminuted fractures,[2] severe swelling of the brain, blood around the brain, and the loss of gray-white differentiation which indicates brain tissue has died.  The victim's skull fractures were the result of severe traumatic force of a type most commonly seen following an automobile accident.  The victim had no chance for a meaningful recovery.  The bleeding was acute and the fractures showed no signs of healing.

The neuro-radiologist testified a person suffering the type of injury inflicted upon the victim would be immediately severely symptomatic, exhibiting:

        (1)  alteration or loss of consciousness;

        (2)  alteration in breathing;

---

[2] In a comminuted fracture the bone is broken into multiple pieces.

(3) likely seizures;

(4) inability to walk, move, or eat;

(5) possible foaming at the mouth; and

(6) no purposeful movement.

The expert testified the severity of the fractures were of a type caused either by an automobile accident, by having been dropped from a two-story building, or from intentionally applied force. While she could not give an exact time, the onset of symptoms would have been very soon after the injury, if not immediate.

The forensic pathologist autopsied the victim's body on July 19, 2008. She found the head injuries were caused either by a single hit or compression, or possibly by one hit on each side of the victim's head. She testified the injury occurred between July 11 and July 14.[3]

Finally, a MUSC doctor who serves as director of the Violence Intervention and Prevention Division in the pediatric department testified. She observed the victim on July 15, finding him very thin, on a respirator, and totally unconscious with fixed and dilated pupils. In addition to the skull fractures, she found a number of unexplained/atypical bruises on the victim: one on his upper right thigh close to his buttocks; one close to his waist; and one on the inside of his leg. The bruises could have been inflicted contemporaneously with the head injuries. The head injuries had to have been inflicted on July 14, and it would have taken less than a minute to fracture the victim's skull. Finally, this doctor opined that the injury must have been inflicted on the 14th as the victim would have died very soon after if not placed on a respirator. She estimated the injuries were inflicted within three hours of his arrival at the Conway Hospital ER at 6:58 pm on July 14.

## ISSUE

Whether the Court of Appeals erred in failing to reverse petitioners' convictions for homicide by child abuse and

---

[3] The State amended the indictments before trial to specify the fatal injury occurred on July 14.

unlawful conduct towards a child, and in reversing the petitioners' convictions for aiding and abetting homicide by child abuse?

## ANALYSIS

In this case we are primarily concerned with whether the State presented any evidence of identity to support the submission of the three charges to the jury. Since the issues all involve a directed verdict, we review the evidence in the light most favorable to the State. *State v. Buckmon*, *supra*. We begin with the homicide by child abuse charges.

### A. Homicide by Child Abuse.

The application of the directed verdict standard in a circumstantial evidence case where one of two persons must have killed a child is set forth in *State v. Hepburn*, 406 S.C. 416, 753 S.E.2d 402 (2013):

> Homicide by child abuse cases are difficult to prove because often the only witnesses are the perpetrators of the crime. What separates this case from a case like *Smith*[4] is that every piece of the State's evidence establishes (1) Appellant was asleep at the time the victim sustained her injuries, (2) Appellant was only awoken after Lewis retrieved the unresponsive victim from her crib, and (3) the victim appeared to be acting normally until after Appellant put the victim to sleep and went to sleep herself. As in *Smith*, medical testimony adduced at trial indicated that the victim would not have appeared "normal" within a short period of time after her injuries were inflicted due to the nature and extent of her neurological injuries. However, there is no evidence that Appellant herself was aware of the victim's injuries, let alone caused them. Thus, we find this case distinguishable from *Smith*.

In *Smith*, the mother and her boyfriend were jointly tried for the death of the mother's young daughter. Both defendants were convicted of homicide by child abuse and aiding and abetting that offense. On appeal, the boyfriend argued he

---

[4] *State v. Smith*, 359 S.C. 481, 597 S.E.2d 888 (Ct. App. 2004).

was entitled to a directed verdict on both counts as the evidence showed, at most, his mere presence at the crime scene. The Court of Appeals disagreed, finding the evidence showed the two defendants were together with the child for the entire period during which the child was shaken with sufficient force to kill her, and suffered more than one blow to the head inflicted with sufficient force to fracture her skull. Further, the evidence showed that her impairment would have been obvious. In addition, there was "evidence of a probable cover-up."

Here, the State's evidence narrowed the window of opportunity during which the fatal injury must have been inflicted to between 4:00 pm and 6:05 pm on Sunday, July 14. The State's evidence placed both petitioners at the home during this period. Just as the only evidence in *Hepburn* was that the appellant was asleep at all critical times, the only evidence here was that the child was sleeping and breathing normally until Gorman found him in distress shortly after 6:00 pm. Further, the present cases are distinguishable from *Smith* in that petitioners were not together at all relevant times, and unlike *Smith*, where the only evidence was the child's injuries would have been immediately apparent, here there was evidence that a layperson might not be able to distinguish between a sleeping child and an unconscious one. Finally, unlike *Smith*, the State presented no "evidence of a probable cover-up."

We hold there is sufficient evidence to uphold the Court of Appeals' ruling that the motion for a directed verdict on homicide by child abuse charge was properly denied as to Gorman, but hold there is no evidence to support the denial of Palmer's motion. The State's evidence places Gorman alone with the victim at 4:00 pm when she first returned home and again at 6:00 pm when the victim was found in grave distress. The medical evidence would support a finding that Gorman inflicted the fatal blow when she first returned home and that when she and Palmer checked on the child from the doorway at 4:15 pm, the victim's injuries may not have been apparent to a layperson. Alternatively, there was evidence that the blow(s) must have been inflicted immediately preceding the expression of symptoms, which is evidence from which a jury could conclude that Gorman injured the child when she went alone to check on him at 6:00 pm. Further, Gorman admitted mistreating the victim by shaking, spanking, and overdosing him, and numerous witnesses testified to her unusual affect and statements following the child's injury.

There was sufficient circumstantial evidence that Gorman committed homicide by child abuse, but there is no evidence in the case-in-chief that Palmer was alone

with the victim after around 3:30 pm, when the victim fell asleep.  Thus, as in *Hepburn*, the State produced no evidence that Palmer "was aware of the victim's injuries, let alone caused them."  *Hepburn*, 406 S.C. at 442, 753 S.E.2d at 416.

## B.  Unlawful Conduct Towards a Child.

The Court of Appeals upheld the trial court's denial of both petitioners' motions for directed verdicts on the charges of unlawful conduct towards a child in violation of S.C. Code Ann. § 63-5-70 (2010).[5]  This statute provides:

> (A)  It is unlawful for a person who has charge or custody of a child, or who is the parent or guardian of a child, or who is responsible for the welfare of a child as defined in Section 63-7-20 to:
>
> > (1)  place the child at unreasonable risk of harm affecting the child's life, physical or mental health, or safety;
> >
> > (2)  do or cause to be done unlawfully or maliciously any bodily harm to the child so that the life or health of the child is endangered or likely to be endangered; or
> >
> > (3)  willfully abandon the child.

We find there is no evidence in this record that Palmer either harmed the victim or was aware Gorman was harming him.  In fact, the State does not contest Palmer's entitlement to a directed verdict on this charge in its respondent's brief on certiorari.  On the other hand, Gorman told at least two people that she was continuing to give the victim Xyzal, which has a sedative effect, after it was no longer medically indicated, and in amounts three to five times the recommended dosage.  This alone is some evidence she placed the victim at an unreasonable risk of harm.  Further, she admitted lacking patience, smacking the victim on his hands and his diapered behind, and shaking him, but not hard.  From this evidence, a jury could find Gorman acted maliciously in causing bodily harm, as reflected in the unusual bruises found on the victim's body on July 14.

---

[5] At the time of the petitioners' indictment this statute was codified as § 20-7-50.

We affirm the Court of Appeals' decision to affirm the trial court's denial of Gorman's directed verdict motion on the charge of unlawful conduct towards a child, but reverse its decision as to Palmer's motion.

## C. Aiding and Abetting Homicide by Child Abuse.

The Court of Appeals reversed both petitioners' convictions for aiding and abetting homicide by child abuse, stating simply "we find the State presented no direct evidence and insubstantial circumstantial evidence that either Palmer or Gorman knowingly undertook any action to aid or abet that abuse." *State v. Palmer*, 408 S.C. at 234, 758 S.E.2d at 205. The State contends the Court of Appeals erred in reversing these convictions. We disagree.

A person aids and abets homicide by child abuse under S.C. Code Ann. § 16-3-85(A)(2) (2003) when he "knowingly aids and abets another person to commit child abuse or neglect [which] results in the death of a child under the age of eleven." The State would have the Court speculate, despite the absence of any evidence, that both petitioners actually entered the victim's bedroom around 4:30 pm where one abused him in the presence of the other, who thus aided and abetted the perpetrator by failing to seek medical help for an hour and a half. *Compare Smith*, *supra*. There is no evidence other than rank speculation that such an incident occurred. Moreover, while "omission which causes harm" can constitute aiding and abetting child abuse or neglect (§ 16-3-85(B)(1)), there is no evidence that more prompt treatment would have mitigated the victim's injuries and thus we do not perceive potential liability for the non-abuser even if he or she were aware of the abuse. For this reason, even were there evidence that Palmer had hurt the victim during the day while alone, there is no evidence that any delay in seeking medical attention by Gorman caused the victim harm beyond that inflicted by the perpetrator. Finally, *State v. Lewis*, 403 S.C. 345, 743 S.E.2d 124 (Ct. App. 2013) *cert. dismissed as improvidently granted* 411 S.C. 647, 770 S.E.2d 398 (2015), establishes that neither knowledge of another's intent to commit a crime nor failure to act to stop abuse are sufficient to deny a directed verdict on a charge of aiding and abetting homicide by child abuse. *Lewis*, 403 S.C. at 356, 743 S.E.2d at 129-130.

We therefore affirm the Court of Appeals' decision to reverse the trial court's denial of each petitioner's motion for a directed verdict on the charge of aiding and abetting homicide by child abuse.

## CONCLUSION

We affirm the Court of Appeals' ruling on the aiding and abetting homicide by child abuse convictions.  We affirm the Court of Appeals' decision to the extent it upholds the denial of Gorman's directed verdict motions on the charges of homicide by child abuse and unlawful conduct towards a child, but reverse its decisions as to Palmer.  For these reasons, the decision of the Court of Appeals is

**AFFIRMED IN PART; REVERSED IN PART**.

**TOAL, C.J., BEATTY, KITTREDGE and HEARN, JJ., concur.**